**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **BUDDY GATES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:12CV 4 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Buddy Gates for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has

been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a

Brief in support of the Complaint. (Doc. No. 14). Defendant filed a Brief in Support of the

Answer. (Doc. No. 19).

## Procedural History

On August 24, 2007, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on February 1, 2007. (Tr. 199-211). This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated August 23, 2010. (Tr. 56-57, 9-

18). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on November 25, 2011. (Tr. 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

A.     **ALJ Hearing**

Plaintiff's administrative hearing was held on August 17, 2010. (Tr. 25). Plaintiff was present by video teleconference, and was represented by counsel. (<u>Id.</u>). Also present was vocational expert Amy Salva. (<u>Id.</u>).

The ALJ examined plaintiff, who testified that he was thirty years of age, and was incarcerated at Farmington Correctional Center at the time of the hearing. (Tr. 27). Plaintiff stated that his incarceration began on April 22, 2009, and that he expected it to end on October 17, 2011. (<u>Id.</u>).

Plaintiff testified that he worked at thirty-two jobs in the ten-year period prior to his incarceration. (<u>Id.</u>). Plaintiff stated that his longest position was working as a medication delivery driver, which he performed for two years. (<u>Id.</u>).

Plaintiff testified that he was married, and had one son and three stepchildren. (Tr. 28).

Plaintiff stated that he did not have a daily work detail at his institution. (<u>Id.</u>). Plaintiff testified that he was in the Sex Offender Program, which involved learning to control his thoughts. (<u>Id.</u>). Plaintiff stated that the program offered anger management classes. (<u>Id.</u>). Plaintiff testified that he is usually in class from 7:20 a.m. to 4:30 p.m. (<u>Id.</u>).

Plaintiff stated that he has been diagnosed with attention deficit hyperactivity disorder ("ADHD") in the past. (<u>Id.</u>). Plaintiff testified that he was not taking any medication for this

impairment at the time of the hearing, although he had reported symptoms of ADHD to medical staff. (Tr. 29). Plaintiff stated that he was not taking any medications at the time of the hearing. (Id.).

Plaintiff testified that he was serving time for second degree statutory rape. (Id.).

Plaintiff stated that he has had problems with substance abuse in the past. (Id.). Plaintiff testified that his drug of choice was marijuana, and he also consumed alcohol. (Id.).

Plaintiff stated that he has asthma, and that he had quit smoking. (Id.). Plaintiff testified that he used an inhaler three to four times a day. (Tr. 30).

Plaintiff stated that he was able to do everyday things, such as shop for groceries, prior to his incarceration. (Id.). Plaintiff testified that he was not a good money manager, and that his wife would have to help him manage his funds. (Id.).

Plaintiff stated that he enjoyed hunting and fishing. (Id.). Plaintiff testified that he also enjoyed cooking with his stepson. (Id.). Plaintiff stated that his stepson would help him bake cookies and cakes. (Tr. 31).

Plaintiff testified that he earned $8,912.00 in 2008 working at Premium Standard Farms. (Id.). Plaintiff stated that he was fired form this position because he could not get along with his boss. (Id.). Plaintiff testified that he has had serious problems with supervisors in the past due to poor communication skills. (Id.). Plaintiff stated that he was working on this problem in the prison program, although he did not believe he was making much progress. (Id.).

Plaintiff testified that he was able to lift 125 pounds with ease. (Tr. 32).

Plaintiff stated that he was six-feet, two inches tall, and weighed 186 pounds. (Tr. 33).

Plaintiff testified that he was unable to bend down and pick things off the floor due to

lower back pain, although he was able to squat.  (Id.).  Plaintiff stated that he was able to climb

stairs and ladders.  (Id.).  Plaintiff testified that he occasionally had difficulty balancing.  (Id.).

Plaintiff stated that he shakes when he tries to hold onto things like a cup of coffee.  (Tr. 34).

Plaintiff testified that he has problems with extreme heat.  (Tr. 35).

Plaintiff stated that he has difficulty concentrating and remembering.  (Id.).  Plaintiff

testified that he often gets bored and forgets the task he was attempting to complete.  (Id.).

Plaintiff stated that he has difficulty with his short-term memory.  (Id.).

Plaintiff testified that he expected to be in the sex offender program until December 5,

2010.  (Tr. 36).  Plaintiff stated that he worked in prison in the dining department.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that he last worked at Premium

Standard Farms for a period of three to four months.  (Id.).  Plaintiff stated that he was terminated

from this position.  (Tr. 37).

Plaintiff testified that in 2007, he worked at Iowa Steel and Wire.  (Id.).  Plaintiff stated

that he was terminated from this position because he had an argument with his boss.  (Id.).

Plaintiff testified that, since February of 2007, he has had problems with anger and

explosions of anger.  (Id.).  Plaintiff stated that he experiences three to four such explosions of

anger every other month.  (Id.).  Plaintiff testified that, prior to his incarceration, he experienced

anger explosions about every other day.  (Id.).

Plaintiff stated that he has had some mental health treatment.  (Id.).  Plaintiff testified that

he saw Dr. Jeffrey Harden in Kirksville, and received some other mental health treatment.  (Tr.

38).

The ALJ next examined vocational expert Amy Salva, who testified that plaintiff has never

held any one position long enough to constitute substantial gainful activity ("SGA"). (Tr. 39). Ms. Salva stated that the positions that come closest to SGA are: meat boner (medium, semi-skilled, SVP 4); and furniture delivery driver (medium, unskilled, SVP 2). (Tr. 39-40).

The ALJ re-examined plaintiff, who testified that he completed high school and earned some college credits. (Tr. 40). Plaintiff stated that he earned about eleven credit hours in college, and then quit because he became bored. (Id.).

Plaintiff's attorney examined plaintiff, who testified that he took LD classes in high school. (Id.). Plaintiff stated that he was suspended a few times in high school due to his anger issues. (Tr. 41).

The ALJ asked Ms. Salva to assume a hypothetical claimant with plaintiff's background and the following limitations: able to lift up to fifty pounds occasionally and twenty-five pounds frequently; stand and walk six hours out of eight; sit six hours out of eight; unlimited ability to push and pull with the extremities; unable to stoop; can occasionally balance, kneel, crouch, and crawl; can frequently handle bilaterally; must avoid concentrated exposure to heat; limited to simple, unskilled work of SVP 2 or less; limited contact with the general public, supervisors, and coworkers. (Tr. 41-42). Ms. Salva testified that the claimant would be unable to return to plaintiff's past work. (Tr. 42). Ms. Salva stated that the claimant would be able to perform other work, such as order filler, which was medium, unskilled, and has an SVP of 2 (175,000 positions nationally, 6,000 positions in Missouri); farm worker, which is medium and unskilled (26,000 positions nationally, 400 in Missouri); retail marker, which is light (260,000 positions nationally, 5,000 in Missouri); and photocopy machine operator, which is light (70,000 positions nationally, 1,900 in Missouri). (Tr. 42-43).

The ALJ next asked Ms. Salva to assume the same hypothetical claimant, except that the claimant is unable to work a full eight-hour workday and forty-hour workweek on an ongoing and consistent basis. (Tr. 43). Ms. Salva testified that there would be no jobs that such an individual could perform. (Id.).

Plaintiff's attorney next examined Ms. Salva, who testified that a GAF score of 30 is typically inconsistent with any competitive work. (Tr. 44). Ms. Salva stated that an individual who had temper outbursts more than once per day, which involved yelling at other workers and throwing things would not be tolerated in competitive employment. (Tr. 45).

The ALJ re-examined plaintiff, who testified that he had been experiencing anger issues since he was eight or nine years old. (Id.). Plaintiff stated that he was working on learning to control his anger in prison, and that he experienced anger blow-ups less often but his anger blow-ups were still severe. (Id.). Plaintiff testified that his anger has not really improved since he stopped using marijuana and alcohol. (Tr. 46). Plaintiff stated that his anger outbursts are caused by people talking about his family, or people telling him he needs to do something or telling him that he is wrong. (Id.).

Plaintiff testified that he received treatment for his anger when he was younger. (Id.). Plaintiff stated that he was placed on medication, but he still experienced blow-ups. (Id.).

Plaintiff testified that he was not taking any psychotropic medication in prison because the mental health advisor had not recommended that he be put on medication. (Id.).

Plaintiff stated that he saw Dr. Harden because he was having "things in life that was making [him] mad with [his] marriage and stuff like that." (Tr. 47). Plaintiff testified that Dr. Harden told him that his problems with anger stem from his childhood. (Id.).

**B.    Relevant Medical Records**

On August 22, 2007, plaintiff presented to Jeffrey Harden, D.O., for a psychiatric examination in connection with his application for Medicaid services. (Tr. 371-73). Dr. Harden indicated that plaintiff has been diagnosed with long-standing psychiatric disorder extending back into his childhood. (Tr. 371). Dr. Harden stated that plaintiff was evaluated in 1996 and rendered the diagnoses of ADHD predominantly hyperactive type; oppositional defiant disorder;[1] depressive disorder; learning disability; and possible schizophreniform disorder.[2] (Id.). Dr. Harden indicated that plaintiff was evaluated in 2000, at which time he was diagnosed with ADHD, oppositional defiant disorder, learning disability, bipolar disorder type II,[3] and questionable borderline mental retardation. (Id.). Plaintiff reported that he was capable of performing employment, but was unable to sustain employment longer than six months because of the adversarial and argumentative attitudes that he brings to the work place. (Id.). Plaintiff indicated that he had worked at thirty-four jobs in his lifetime, and that he was fired from twenty-eight of these jobs. (Id.). Plaintiff reported difficulties getting along with co-workers and supervisors. (Id.). Plaintiff had taken medication in the past, but was not taking any medication at the current time. (Id.). Plaintiff reported that he was capable of driving, cooking, laundry, managing his own hygiene, and administering his own medications. (Tr. 371-72). Plaintiff

---

[1]A disorder of childhood or adolescence characterized by a recurrent pattern of negativistic, hostile, and disobedient behavior toward authority figures. Stedman's Medical Dictionary, 570 (28th Ed. 2006).

[2]A disorder with essential features that are identical with those of schizophrenia, with the exception that the duration is shorter than six months. See Stedman's at 570.

[3]An affective disorder characterized by the occurrence of alternating hypomanic and major depressive episodes. Stedman's at 568.

indicated that he enjoys hunting and racing his car. (Tr. 372). Plaintiff reported difficulty

managing his own money because he disregards bills in favor of other things. (Id.). Upon mental

status examination, plaintiff showed logical thought processes with no speech eccentricities, and

he displayed a well modulated affect. (Tr. 372-73). Plaintiff reported lifelong difficulties with

concentration. (Tr. 373). No abnormalities were noted with regard to plaintiff's cognitive

functioning, concentration, or abstract thought. (Id.). Plaintiff showed significant insight into his

own employment limitations and into his own impulsive behaviors. (Id.). Plaintiff showed poor

insight into the dangers that he subjects his family to in terms of his speeding and racing on public

highways. (Id.). Plaintiff's judgment to hypothetical social situations was appropriate, but his

judgment as to how he manages his motor vehicle on highways was poor. (Id.). Plaintiff's

immediate recall was such that he was able to accurately recollect three facts following a five

minute delay, and his remote recall was such that he was able to accurately recollect four of the

most recent five presidents. (Id.). Dr. Harden diagnosed plaintiff with ADHD, principally

hyperactive type; polysubstance abuse (alcohol and marijuana) in partial remission; antisocial

personality traits; and a current GAF score of 30,[4] and the highest GAF score for the past year of

30. (Id.). Dr. Harden stated that plaintiff presents identifying a lifelong history of impulsive

behaviors and severe difficulties accepting the authority of supervisors, teachers, and employers.

(Id.). Dr. Harden stated that plaintiff has markedly impaired judgment in a variety of areas in his

life. (Id.). Dr. Harden recommended that plaintiff be under ongoing psychiatric care and have his

---

[4]A GAF score of 21 to 30 is indicative of behavior "considerably influenced by delusions
or hallucinations OR serious impairment in communication or judgment (e.g., sometimes
incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost
all areas (e.g., stays in bed all day; no job, home, or friends)." Diagnostic and Statistical Manual
of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

ADHD treated definitively.  (Id.).

Glen D. Frisch, M.D., a state agency physician, completed a Psychiatric Review Technique on September 26, 2007, in which he expressed the opinion that plaintiff had mild limitations in his activities of daily living, and moderate limitations in his ability to maintain social functioning and ability to maintain concentration, persistence, or pace.  (Tr. 385).  Dr. Frisch also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (Tr. 374-75).  In his Functional Capacity Assessment, Dr. Frisch found that plaintiff retained the ability to understand and remember simple instructions; can carry out simple work instructions, maintain adequate attendance, and sustain an ordinary routine without special supervision; can interact adequately with peers and supervisors in a work setting that has minimal demands for social interaction; and can adapt to minor change in a simple work setting.  (Tr. 376).

Plaintiff underwent an intake mental health screening upon his incarceration with the

Department of Corrections ("DOC") on May 4, 2009.[5]  (Tr. 394).  Plaintiff reported that he had

taken various medications until 2004, and that he had been on no medications since 2005.  (Id.).

Plaintiff denied a history of suicide attempts.  (Id.).  Plaintiff also denied a history of physical or

mental abuse.  (Id.).  Upon mental status exam, plaintiff was alert, coherent, and well-oriented.

(Id.).  Plaintiff's mood was euthymic and his affect was congruent.  (Id.).  Plaintiff's thought

process was logical, linear, and goal-directed.  (Id.).  Plaintiff's reality testing was intact, with no

indication of hallucination, delusion, or mania.  (Id.).  Plaintiff denied suicidal or homicidal

ideation.  (Id.).  The examiner stated that there were not blatant signs or symptoms presented,

observed, or endorsed which were consistent with a mental disorder at that time.  (Id.).  No

follow-up was scheduled.  (Id.).

　　　During a November 12, 2009 DOC evaluation, plaintiff's behavior was described as

pleasant and appropriate.  (Tr. 402).

　　　Plaintiff requested to be seen while in the DOC on January 21, 2010, at his wife's

suggestion.  (Tr. 397).  Plaintiff reported that he was evaluated in the DOC in 2001 and 2009, and

that he saw over twelve psychiatrists on the outside in between.  (Id.).  Plaintiff complained of

poor sleep ("two hours sleep a night"), and problems concentrating.  (Id.).  Plaintiff reported a

past history of alcohol and cannabis abuse.  (Id.).  Plaintiff described himself as easily irritated.

(Id.).  Upon examination, plaintiff was cooperative, and open to suggestions of ways to deal with

his mood.  (Id.).  Plaintiff was using distorted thoughts to keep himself upset.  (Id.).  Plaintiff

reported that he was sexually abused by his sister when he was nine years old but his parents did

---

[5]The credentials of the examining mental health treatment providers at the DOC are not
provided.  Both parties, however, rely on this evidence.

nothing to his sister. (Id.). Plaintiff denied auditory hallucinations, although he reported them in the past. (Id.). Plaintiff's speech was within normal limits, and his remarks were appropriate. (Id.). Plaintiff denied any current homicidal or suicidal thoughts or plans, although he thought about shooting himself in the past. (Id.). The examiner stated that plaintiff was feeling irritable but denying any homicidal or suicidal thoughts or plans. (Id.). Plaintiff was encouraged to exercise on a regular basis to decrease stress and improve his mood. (Id.). Plaintiff was also encouraged to sign up for a class. (Id.).

On March 16, 2010, plaintiff reported that he was having problems with "racing thoughts, internal fears, and trust." (Tr. 397). Plaintiff reported that he has been able to handle his racing thoughts with exercise, however he feared facing his family when he leaves the DOC. (Id.). Upon examination, plaintiff was worried but cooperative and open to suggestions. (Tr. 398). Plaintiff's remarks were appropriate, his speech was within normal limits, and he denied any homicidal or suicidal thoughts or plans. (Id.). Plaintiff was managing his racing thoughts with exercise. (Id.). Plaintiff was encouraged to continue exercising on a regular basis. (Id.). Ways to challenge his negative, cognitive distortions were discussed. (Id.).

Plaintiff underwent pulmonary function testing on April 21, 2010, which was suggestive of asthma. (Tr. 409-10). Plaintiff was prescribed an inhaler. (Tr. 410).

**The ALJ's Determination**

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2.      The claimant has not engaged in substantial gainful activity since February 1,

2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.　The claimant has the following severe impairments: attention deficit hyperactivity disorder, antisocial personality disorder, polysubstance abuse in remission, and asthma (20 CFR 404.1520(c) and 416.920(c)).

4.　The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.　After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) in that he can lift and carry up to 50 pounds occasionally and 25 pounds frequently; can stand and walk 6 hours total in an 8 hour workday and sit 6 hours total as well; has an unlimited ability to push or pull with the extremities; cannot stoop and can only occasionally balance, kneel, crouch, or crawl; can frequently but not continuously handle bilaterally; must avoid concentrated exposure to heart; can only perform simple, unskilled work of SVP2 or less due to a poor concentration ad memory, and must have only limited contact with the general public, supervisors and coworkers.

6.　The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.　The claimant was born on March 1, 1980 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.　The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.　Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.　Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.　The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-17).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on August 15, 2007, the claimant is not disabled under sections 216(I)     and 223(d) of the Social Security Act.

(Tr. 17).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

C.    **Plaintiff's Claims**

In his sole claim, plaintiff argues that, in determining plaintiff's mental RFC, the ALJ erred in relying on the findings of a non-examining state agency physician.

RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of his limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).  An RFC determination made by an

ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) in that he can lift and carry up to 50 pounds occasionally and 25 pounds frequently; can stand and walk 6 hours total in an 8 hour workday and sit 6 hours total as well; has an unlimited ability to push or pull with the extremities; cannot stoop and can only occasionally balance, kneel, crouch, or crawl; can frequently but not continuously handle bilaterally; must avoid concentrated exposure to heart; can only perform simple, unskilled work of SVP2 or less due to a poor concentration and memory, and must have only limited        contact with the general public, supervisors and coworkers.

(Tr. 13).

In determining plaintiff's RFC, the ALJ first assessed the credibility of plaintiff's subjective complaints of pain and limitations under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. 739 F.2d at 1322.

The ALJ noted that the objective medical evidence did not support plaintiff's allegations of disability. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ first noted that there is no evidence of a back impairment or any objective evidence of a physical impairment other than asthma. (Tr. 14). Plaintiff does not challenge the ALJ's determination with regard to plaintiff's physical impairments.

With regard to plaintiff's allegations regarding his mental impairments, the ALJ first noted that plaintiff was described throughout the record as "patient and polite," "cooperative" and "pleasant" with "appropriate" behavior. (Tr. 270, 397, 402). The ALJ indicated that there is no evidence that plaintiff failed to get along with any examiner, and he cooperated fully with the ALJ. (Tr. 14). The ALJ stated that this is probative in this case, where plaintiff's primary allegation relates to his inability to get along with others. (Id.).

Plaintiff argues that the ALJ erred in noting that plaintiff did not engage in inappropriate behavior. "While the ALJ's observations cannot be the sole basis for his decision, it is not an error to include his observations as one of several factors." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008). In this case, as will be discussed further below, the ALJ did not rely solely on his own observations regarding plaintiff's behavior in making his decision. Rather, the ALJ properly pointed out plaintiff's lack of inappropriate behavior as one of many factors detracting from the credibility of his subjective complaints.

The ALJ next pointed out that there is little medical evidence from mental health professionals despite plaintiff's allegations of disabling mental impairments that have existed since childhood. This is an appropriate consideration, because the fact that a claimant fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ noted that the few treatment records that are present reveal that plaintiff's mental status was quite good. (Tr. 14). For example, during a May 2009 mental evaluation at the DOC, it was noted that plaintiff had no signs or symptoms presented, observed, or endorsed that were consistent with a mental disorder. (Tr. 14, 394). Plaintiff's subsequent examinations also failed

to reveal any significant symptoms of a mental impairment. (Tr. 397-98). Plaintiff was advised to simply exercise and attend classes. (Id.). The ALJ also properly pointed out that plaintiff was taking no medications, and that plaintiff did not, therefore, have any medication side effects. (Tr. 16).

The ALJ next discussed plaintiff's daily activities. (Tr. 16). The ALJ noted that plaintiff's 2007 function report reveals that plaintiff was able to care for himself and his step-son, and that his daily activities were not "terribly limited." (Tr. 16, 281-96). Plaintiff testified that, prior to his incarceration, he was able to do everyday things, such as shop for groceries, and that he enjoyed hunting, fishing, and cooking with his stepson. (Tr. 30). In addition, the ALJ properly pointed out that plaintiff was able to complete two years of college.[6] (Tr. 15, 254).

The ALJ also discussed the medical opinion evidence. The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). "'[An] ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole.'" Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008) (quoting Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)). See also Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005) (finding that the ALJ had not simply substituted his opinion for the medical evidence when determining the claimant's RFC, but had assessed that RFC based on all the relevant evidence).

The ALJ noted that no treating physician has provided an opinion. (Tr. 16). The ALJ acknowledged that Dr. Harden examined plaintiff in August 2007, and assessed a GAF score of

---

[6]Although plaintiff testified at the administrative hearing that he earned only eleven hours of college credits (Tr. 40), plaintiff reported in his function report that he completed two years of college. (Tr. 254).

30. (Tr. 15). The ALJ stated, however, that Dr. Harden's assessment is based on one examination and that the record does not support Dr. Harden's assessment. (Id.). This finding is supported by the record.

Plaintiff saw Dr. Harden for a one-time examination in connection with his application for Medicaid benefits. (Tr. 371-73). Upon mental status examination, plaintiff showed logical thought processes with no speech eccentricities; displayed a well modulated affect; normal cognitive functioning, concentration, and abstract thought; significant insight into his own employment limitations and into his own impulsive behaviors, but poor insight into the dangers that he subjects his family to in terms of his speeding and racing on public highways; and his judgment to hypothetical social situations was appropriate, but his judgment as to how he manages his motor vehicle on highways was poor. (Tr. 372-73). Dr. Harden diagnosed plaintiff with ADHD, principally hyperactive type; polysubstance abuse (alcohol and marijuana) in partial remission; antisocial personality traits; and a current GAF score of 30, with the highest GAF score for the past year of 30. (Tr. 373). The ALJ properly pointed out that the record, including Dr. Harden's own mental status examination, did not support such a low GAF score. (Tr. 15). The ALJ noted that a GAF score of 21 to 30 is indicative of behavior "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." (Id.).[7] The ALJ noted that there was no evidence of delusion or hallucination, plaintiff was able to communicate effectively with everyone in the record and is not suicidal, he functions adequately with his family,

---

[7]See DSM-IV at 32.

cooperated with mental health professionals while incarcerated, was able to graduate high school and complete two years of college, and engages in significant daily activities. (Id.).

The ALJ indicated that he was assigning "great weight" to the opinion of Dr. Frisch, the state agency physician, as his opinion was well-supported by the medical record and consistent with the objective evidence. (Tr. 16). Plaintiff contends that the ALJ erred in relying on the opinion of a non-examining state agency physician.

Dr. Frisch completed a Psychiatric Review Technique on September 26, 2007, in which he expressed the opinion that plaintiff had mild limitations in his activities of daily living, and moderate limitations in his ability to maintain social functioning and ability to maintain concentration, persistence, or pace. (Tr. 385). Dr. Frisch also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. (Tr. 374-75). In his Functional Capacity Assessment, Dr. Frisch found that plaintiff retained the ability to understand and remember simple instructions; can carry out simple work instructions, maintain adequate

attendance, and sustain an ordinary routine without special supervision; can interact adequately with peers and supervisors in a work setting that has minimal demands for social interaction; and can adapt to minor change in a simple work setting. (Tr. 376).

State agency consultants are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation, and as such, the ALJ must consider their findings as opinion evidence. 20 C.F.R. §§ 404.1527(e)(2)(I), 416.927(e)(2)(I). In evaluating the opinion of the state agency physician, the ALJ will weigh the findings of the consultant using the relevant factors in paragraphs (a) through (e) in 20 C.F.R. § 404.1527 and § 416.927, as the ALJ would in evaluating the opinions of other medical sources. Id. Just as with the opinions of other medical sources, the ALJ must explain the weight given to the opinions of the state agency consultant, unless a treating source's opinion is given controlling weight. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). In determining the weight to be given to the state agency consultant's opinion, the ALJ "must minimally articulate his reasons for crediting or rejecting evidence of disability." Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997) (quoting Scively v. Sullivan, 966 F.2d 1070, 1076 (7th Cir. 1992)) (internal citations omitted).

Plaintiff contends that Dr. Frisch offered inconsistent conclusions. Specifically, plaintiff notes that Dr. Frisch found that plaintiff had moderate limitations in many areas, yet concluded that plaintiff was capable of understanding and remembering simple instructions, carrying out simple work instructions, maintaining adequate attendance and sustaining an ordinary routine without special supervision, interacting adequately with peers and supervisors in a work setting that has minimal demands for social interaction, and adapting to minor changes in a simple work setting. (Tr. 374-76). Dr. Frisch's functional capacity assessment, however, is consistent with

the moderate limitations he found.  For example, he limited plaintiff to understanding and remembering, and carrying out only simple instructions; and limited plaintiff to a work setting that has minimal demands for social interaction.  (Tr. 376).

The ALJ in this case properly considered the opinions of Dr. Frisch.  Dr. Frisch specifically addressed aspects of the record upon which he relied in reaching his conclusions.  Dr. Frisch discussed the report of Dr. Harden, including his findings on mental status examination.  Significantly, the ALJ did not rely exclusively on the opinions of Dr. Frisch, but, rather evaluated the record as a whole.

In sum, the RFC determined by the ALJ is supported by substantial evidence on the record as a whole.  The ALJ conducted a proper credibility analysis and found plaintiff's subjective allegations were not entirely credible.  The ALJ's RFC determination was based on plaintiff's testimony, the objective medical record, and the opinion evidence, including the opinion of the state agency physician.

The hypothetical posed to the vocational expert was consistent with the ALJ's RFC determination.  The vocational expert testified that the hypothetical claimant could perform work as an order filler, farm worker, and photocopy machine operator.  (Tr. 42).  Thus, the ALJ's decision finding plaintiff was not disabled is supported by substantial evidence.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  25th   day of March, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE